**STATE**

v.

**Larry E. BATON.**

**No. 83–428–C.A.**

Supreme Court of Rhode Island.

Feb. 26, 1985.

---

Dennis J. Roberts II, Atty. Gen., Anthony DelBonis, Sp. Asst. Atty. Gen., Providence, for plaintiff.

Joseph Romano, Jr., Providence, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

This is an appeal by the defendant, Larry Baton, from a judgment of conviction entered against him in the Superior Court, before a trial justice sitting with a jury, on an indictment charging him with first-degree murder and burglary in connection with the death of his estranged wife, Holly Baton. Following the denial of the defendant's motion for a new trial, the trial justice sentenced him to consecutive life sentences on September 17, 1982. The relevant facts are as follows.

On August 11, 1981, Detective Sergeant Louis Dusseault of the Rhode Island State Police physically arrested defendant at gunpoint in a shopping area in Stonington, Connecticut. At the time of the arrest, Dusseault was aware of a warrant issued the day before by a justice of the Fourth Division District Court of Rhode Island for defendant's arrest for the murder of defendant's wife. He was aided in the arrest by other members of the Rhode Island State Police and the Stonington police, which included Officer Mitchell. While in the parking lot, Dusseault read defendant his Fifth Amendment rights from a rights card, then placed him in a squad car, which then took him to the Stonington police station. During the trip, Dusseault testified, he again advised defendant of his rights and defendant responded that he knew them. When he asked defendant if he wanted an attorney, defendant replied, "No, not at this time. I may need one—I

may need one later." The defendant, however, countered Dusseault's testimony at the motion to suppress and testified that he had remained totally silent in the squad car, but he did acknowledge that no threats or coercive promises were made during this period.

The Stonington police station was chaotic because of a fatal accident that had just occurred in the town. The defendant was brought to a detective's room that contained a number of people, including Sergeant Dusseault, Officer Mitchell, and Detective Luigi A. Reali of the Rhode Island State Police, and was read his rights from a waiver-of-rights form. Dusseault, who had read the rights, handed defendant the form to read himself and then went over each of the eight items to ensure that defendant understood them. The defendant claimed that he did understand them and continued to fill in the time, date, and location, then initialed the first six items and finally signed the form. He did not initial item No. 7, which indicates, "After having been informed of my constitutional rights, I do understand these rights, and I agree to give a statement at this time," nor did he initial item No. 8, which states, "I do not want an attorney called or appointed for me at this time." Dusseault interpreted the refusal to initial these two items to mean that defendant did not want an attorney then, but might want one later. When Detective Reali subsequently afforded defendant the use of a telephone, he claims that defendant replied, "No, I don't want to call anyone. I don't want them to know where I am."

The defendant vehemently negated this testimony at the motion hearing and contended both that no one advised him of his rights in the detective's room and that no one asked him if he wanted an attorney. He claims he never told Dusseault or Reali that he did not want an attorney at that time but might want one later, and he claims that he did not initial items No. 7 and 8 because he did want his attorney

present. Furthermore, he testified that he insisted on making a phone call to his parents first and that he wanted to see an attorney.[1] After asking Reali if he could make a phone call, he claims, Reali responded that he could make as many calls as he wanted but he wanted to talk to him first.

The defendant and the officers then moved to a smaller room for the taking of the statement so that they could avoid the confusion resulting from the accident. Reali testified both that he again advised Baton of his right to an attorney and that he again read the waiver-of-rights section at the top of the statement form. Together they read the statement form, which was in a question-and-answer format, and defendant thereon signed his name and wrote, "[y]es, they are true" after each of these questions and answers. He also drew a picture of the scene where Holly Baton was found, read the statement over, initialed the mistakes, and finally signed every page. Both Reali and defendant agreed that defendant was not abused and was offered sustenance during this period.

While they were in the smaller room, Attorney Charles Rogers called the police station. The conversation was taped, but the time of the call was not recorded. The chief of the Stonington police department, Carl Johnson, who was very busy because of the accident, was on another call when Officer Adriano told him that Rogers was on the phone, so he told Adriano to tell Rogers to wait. A few minutes later, Rogers buzzed again and Johnson told Adriano to get Rogers's number so that he could call him back. Rogers, however, waited and insisted upon talking to Johnson. He finally got through and told Johnson he wished to speak to a "Mr. Bateman" and that he did not want defendant to give a statement. Johnson then told John Turner of the Rhode Island State Police to tell Reali that Rogers was on the phone, but he did not tell him that defendant should refrain from making a statement. Reali tes-

1. The defendant already had an attorney representing him in a domestic case.

tified that he did not know that Rogers was trying to reach Baton until after the statement was finished. Once he knew, he immediately put defendant on the phone.

Once again, defendant refuted the state's testimony and maintained that the officer came in three times to inform them that Rogers was on the phone and that Reali said, "O.K.," but kept on with the statement. When the officer came in the third time, Baton testified at the motion to suppress, he jumped up and said he wanted to speak to the lawyer.

The tape recording of the conversation between defendant and Rogers reveals that when Rogers asked defendant if he wanted him as counsel, defendant responded, "Well if you want to." Rogers then asked if defendant wanted him, and defendant responded, "Well, sure," whereupon defendant told Rogers that he had been advised of his rights and that he had already given a statement.

On appeal, defendant raises the following issues: (1) that he was unlawfully arrested in the State of Connecticut; (2) that his confession was obtained in violation of his Fifth Amendment privilege against self-incrimination and right to counsel; (3) that his confession was obtained in violation of his Sixth Amendment right to counsel; and (4) that the trial justice violated his Fifth Amendment right to be free from double jeopardy when he imposed consecutive life sentences for first-degree murder and burglary.

## I

The defendant claims that the Superior Court justice erred in finding that the statement he made to the Rhode Island State Police was admissible under the law for the following two reasons: (1) his arrest in Connecticut by a Rhode Island State police officer was illegal and (2) his confession was obtained in violation of his Fifth Amendment privilege against self-incrimination and the right to counsel. Because of these violations, he contends, any state-

ments he made should have been suppressed.

### A

■ A police officer may not effectuate an arrest without probable cause, and probable cause exists when the officer has personal knowledge or has been reliably informed of the facts and circumstances that would lead a reasonable person to believe that the arrestee has committed, is committing, or is about to commit a criminal act. *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1890 (1949); *State v. Burns*, R.I., 431 A.2d 1199, 1203 (1981). In determining whether probable cause exists, the court views "the cumulative effect of all the facts and circumstances present at the time of the arrest * * * as through the eyes of a reasonable and cautious police office on the scene * * *." *State v. Welch*, R.I., 441 A.2d 539, 541 (1982) (quoting *In re John C.*, R.I., 425 A.2d 536, 538, *cert. denied*, 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1005 (1981)).

■ The trial justice, in the case at bar, found that Officer Mitchell of the Stonington police department had probable cause to arrest defendant in the parking lot because Mitchell had knowledge of the arrest warrant issued by the Rhode Island District Court and consequently had a right to rely on the determination of the neutral magistrate. The actual physical arrest, made by Sergeant Dusseault of the Rhode Island State Police, was legal because it was made under the aegis of Officer Mitchell. Mitchell was present at the scene and actively involved in the search for defendant. He spotted defendant in the parking lot, and Dusseault, acting as his agent, made the arrest. Even if Dusseault had acted unilaterally, the arrest was still legal because Dusseault, acting as a private person in the State of Connecticut who had probable cause to believe the arrestee had committed a felony, had the right to make an arrest. *Stevenson v. State*, 287 Md. 504, 520, 413 A.2d 1340, 1349 (1980); *Com-*

monwealth ex rel. Duncan v. Rundle, 424 Pa. 385, 387, 227 A.2d 659, 661 (1967).

Since the trial justice could have reasonably determined that the facts and circumstances were sufficient to establish probable cause for defendant's arrest, we shall adhere to his finding.

## B

Although a conviction based upon an involuntary confession deprives the defendant of due process of law, *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908, 915 (1964), and *State v. Fuentes*, R.I., 433 A.2d 184, 189 (1981), a truly voluntary confession is admissible evidence in a criminal prosecution. *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966); *State v. Amado*, R.I., 424 A.2d 1057, 1061 (1981). To determine whether defendant Baton's statement is admissible, we must decide whether he knowingly and voluntarily waived his Fifth Amendment privilege against self-incrimination and right to counsel.

The defendant is entitled to an independent hearing to determine the question of voluntariness of his confession. *Jackson v. Denno*, 387 U.S. at 376–77, 84 S.Ct. at 1780–81, 12 L.Ed.2d at 915; *State v. Boswell*, 73 R.I. 358, 361, 56 A.2d 196, 198 (1947). The test to be applied is whether a defendant's statements were "the product of his free and rational choice" and not a product of coercion in any form. *Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77, 80 (1968); *State v. Lemon*, R.I., 478 A.2d 175, 177–78 (1984); *State v. Ortiz*, R.I., 448 A.2d 1241, 1245 (1982). The state bears the burden of proving by clear and convincing evidence that the defendant waived these rights in an intelligent and informed manner. *State v. Amado*, R.I., 424 A.2d at 1061; *State v. Espinosa*, 109 R.I. 221, 230, 283 A.2d 465, 469–70 (1971). From the evidence presented, the trial justice analyzes the facts and circumstances surrounding the case, including the conduct of the interrogators as well as the behavior and statements of a defendant. He may make such a finding of voluntariness without proof of express waiver if waiver can be clearly inferred from the actions and words of the person interrogated. *North Carolina v. Butler*, 441 U.S. 369, 373–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286, 292–93 (1979); *State v. Fuentes*, R.I., 433 A.2d at 189. His findings of fact, including his credibility determination on the question of voluntariness, must be sustained unless clearly erroneous. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. LaRosa*, 112 R.I. 571, 576, 313 A.2d 375, 377 (1974); *see State v. Ortiz*, R.I., 448 A.2d at 1245–46.

The testimony in the case at bar was inherently contradictory, thus the trial justice had to determine the credibility of each witness before deciding the issue of voluntariness. *State v. Vargas*, R.I., 452 A.2d 310, 312 (1982). Initially, he determined that defendant understood the *Miranda* rights that were given in the police cruiser and several times at the police station. The defendant was also given a waiver-of-rights form, which contained all the *Miranda* admonitions. Detective Reali read the form to defendant, then defendant read it himself and said he understood it. He subsequently filled in the time, date, and location, initialed the first six items and signed the form. The trial justice accepted the state's reasoning that defendant did not sign items No. 7 and 8 because defendant might wish an attorney in the future.

After initialing the waiver-of-rights form, Officer Reali again read defendant his rights, which were printed at the top of the statement form. Reali and defendant read the statement, and defendant then signed his name and wrote, "[Y]es, they are true," after each of these questions and answers. Furthermore, he reread the statement, cor-

rected typographical mistakes, signed every page, and even drew a picture of the murder scene. Both defendant and the police agree that defendant was not physically or mentally abused during this period and that he was offered sustenance.

From the facts and circumstances presented, the conclusion is inescapable that defendant's statement was a product of free and rational choice. He was well aware that he had the right to remain silent, and yet he gave a statement without hesitation. We accordingly affirm the trial justice's finding that defendant knowingly and voluntarily waived his privilege against self-incrimination. See *State v. Verlaque*, R.I., 465 A.2d 207, 210–11 (1983); *State v. Appleton*, R.I., 459 A.2d 94, 96 (1983).

■ In reviewing the totality of the circumstances, *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979); *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938); *State v. Fuentes*, R.I., 433 A.2d at 192, we also find that the trial justice did not err in finding that defendant waived his right to counsel. The most crucial evidence in supporting this conclusion is the taped conversation between defendant and Attorney Rogers. After hearing all the arguments regarding the timing of this call, the trial justice determined that it took place immediately after the statement was given by defendant to the State Police. He also reasonably inferred that the police neither negligently nor intentionally engaged in conduct designed to keep defendant apart from Rogers when the call came in but were prevented from immediately doing so because of the confusion caused by the recent traffic fatality in Stonington. In that conversation, in which defendant had his very first opportunity to speak to counsel, defendant did not seem concerned that he had already made a statement, nor did he seem very eager to retain Rogers as counsel. When Rogers said, "Did they tell you that an attorney was trying to reach you?" he did not respond that he had been asking for one. When Rogers told defendant that defendant's parents had retained him and then asked defendant if he wanted his representation, defendant replied, "If you want to." Rogers then responded, "[I]t's not if I want to or not, it's whether you want me to or not," and defendant then stated, "[W]ell, all right." The trial justice determined that this conversation totally discredited defendant's assertion that he aggressively sought counsel, and he accordingly concluded that this right had been voluntarily and intelligently waived. *See State v. Fuentes*, R.I., 433 A.2d at 190–92.

■ The defendant asserts, however, that this statement should still be suppressed because Chief Johnson knew that Rogers did not want a statement taken and had a duty to prevent Reali from taking it. We find, however, that Chief Johnson would only have violated this duty if an attorney-client relationship existed at that time. This relationship is the product of an agreement between both parties, and as we have previously determined, this relationship was not formed until defendant spoke to Rogers on the telephone. Since this conversation took place after the statement had been completed, defendant's contention is without merit. *State v. Austin*, R.I., 462 A.2d 359, 362 (1983); *State v. Cline*, 122 R.I. 297, 309, 405 A.2d 1192, 1199 (1979).

In review of the record, it is clear that the state proved by clear and convincing evidence that defendant waived his right to remain silent as well as his right to counsel. Accordingly, we find that the trial justice's admission of the statement was not "clearly erroneous." [2]

---

**2.** Even assuming, arguendo, that the arrest was illegal, we find that the statement is still admissible because defendant gave a knowing and intelligent waiver of his Fifth Amendment rights, thereby dispelling the primary taint of the illegal arrest. *Brown v. Illinois*, 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416, 424 (1975); *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441, 454 (1963); *State v. Burns*, R.I., 431 A.2d 1199, 1205 (1981); *State v. LaRosa*, 112 R.I. 571, 575, 313 A.2d 375, 377 (1974).

## II

Defendant Baton next asserts that by failing to inform him of Attorney Rogers's availability, the police impermissibly interfered with his Sixth Amendment right to the presence of counsel. The United States Supreme Court has held that the Sixth Amendment right to counsel attaches only "at or after the time that judicial proceedings have been initiated against him [an accused]—'whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424, 436 (1977) (quoting in part *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972)).

The Supreme Court has most recently addressed this issue of when the Sixth Amendment right to counsel attaches in *United States v. Gouveia,* — U.S. —, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984). *Gouveia* addressed the question of whether prison inmates, held in administrative detention during the investigation of two murders within the prison, were entitled to appointed counsel. The court reiterated the holding in *Kirby* and denied the inmates the appointment of counsel while they were in administrative segregation because adversarial judicial proceedings had not been initiated against them. The Court reasoned that "the 'core purpose' of the counsel guarantee is to assure aid at trial, 'when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor.'" *United States v. Gouveia,* — U.S. at —, 104 S.Ct. at 2298, 81 L.Ed.2d at 154 (quoting in part *United States v. Ash,* 413 U.S. 300, 309, 93 S.Ct. 2568, 2573, 37 L.Ed.2d 619, 626 (1973)). The Court also stated that it recognized that it had extended an accused's right to counsel to certain "critical pre-trial proceedings" but had done so because "the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or by both." *Gouveia,* — U.S.

at —, 104 S.Ct. at 2298, 81 L.Ed.2d at 155 (quoting *United States v. Ash,* 413 U.S. at 310, 93 S.Ct. at 2574, 37 L.Ed.2d at 627); *State v. Delahunt,* 121 R.I. 565, 570–71, 401 A.2d 1261, 1264 (1979).

Defendant Baton had been arrested and subjected to interrogation concerning the murder of his wife. According to *Kirby,* this stage is not considered to be a formal adversarial proceeding, thus we hold that the trial justice did not err in finding that defendant's confession was not obtained in violation of his Sixth Amendment right to counsel.

## III

The defendant's final contention is that the trial justice erred when he imposed consecutive life sentences for murder and burglary. He argues that convictions on both murder and burglary were in contravention of the Fifth Amendment's double-jeopardy clause, which "prohibits both successive prosecution for the same offense as well as multiple punishment for the same offense." *State v. Innis,* 120 R.I. 641, 654, 391 A.2d 1158, 1165 (1978), rev'd *on other grounds,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (quoting *Newton v. State,* 280 Md. 260, 263, 373 A.2d 262, 264 (1977)). To determine whether the same act or transaction constitutes a violation of two distinct provisions, we follow the evidence test adopted by the United States Supreme Court in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932):

"[T]he test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not."

*See State v. Innis,* 120 R.I. at 655, 391 A.2d at 1165; *State v. Grullon,* 117 R.I. 682, 686, 371 A.2d 265, 267 (1977).

Pursuant to G.L.1956 (1981 Reenactment) § 11–23–1,[3] this court has held

---

3. General Laws 1956 (1981 Reenactment) § 11– 23–1 provides:

that double jeopardy bars a conviction of an underlying offense when that offense is used to form a basis of felony-murder. In reaching this conclusion, we reasoned that the two offenses merge because the only element that distinguishes the two is the proof of the victim's death. *State v. Innis*, 120 R.I. at 656, 391 A.2d at 1166; *Newton v. State*, 280 Md. at 269, 373 A.2d at 267. If the homicide can be proven under a theory other than felony-murder, however, the underlying charge may be separately considered by the jury, "if the evidence presented so warrants." *State v. Innis*, 120 R.I. at 658, 391 A.2d at 1167.

In the case at bar, the jury had the right to separately consider the underlying charge because the state did not proceed under a felony-murder theory but proved premeditated deliberation. We find that the murder was not the result of the burglary, rather that the burglary was perpetrated in advancement of the premeditated murder. When there are separate elements in the crimes of burglary and first-degree murder that are not included in the other offense, the offenses do not merge and the trial justice, in the exercise of his discretion, is justified in imposing consecutive life sentences. *See State v. Upham*, R.I., 415 A.2d 1029, 1033 (1980).

The defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

"Murder.—The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing, or committed in the perpetration of, or attempt to perpetrate any arson or any violation of §§ 11–4–2, 11–4–3 or 11–4–4 of the general laws, rape, burglary or robbery, or while resisting arrest by, or under arrest of, any state trooper or policeman in the performance of his duty; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed is murder in the first degree. Any other murder is murder in the second degree. The degree of murder may be charged in the indictment or information, therefor, and the jury may find the degree of murder, whether the same be charged in the indictment or information or not, or may find the defendant guilty of a lesser offense than that charged in the indictment or information, in accordance with the provisions of § 12–17–14."